Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 8847 | **DATE** | 1/7/2005 |
| **CASE TITLE** | ULATOWSKI vs. JOHN STERLING CORP., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The motions for summary judgment [81-1; 83-1] are granted. ENTER MEMORANDUM OPINION AND ORDER.

*Suzanne B. Conlon*

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | number of notices | | | |
| ✓ | Notices mailed by judge's staff. | | JAN 1 0 2005 | | | |
| | Notified counsel by telephone. | | date docketed | | | |
| | Docketing to mail notices. | | | docketing deputy initials | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | | | | |
| | Copy to judge/magistrate judge. | | | 1/7/2005 | | |
| CB | courtroom deputy's initials | 2005 JAN -7 PM 4: 59 | date mailed notice | | | |
| | | Date/time received in central Clerk's Office | PW mailing deputy initials | | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



| | | |
|---|---|---|
| CINDY ULATOWSKI, | ) | |
| | ) | |
| Plaintiff, | ) | No. 03 C 8847 |
| | ) | |
| v. | ) | Suzanne B. Conlon, Judge |
| | ) | |
| JOHN STERLING CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Cindy Ulatowski ("Ulatowski") sues John Sterling Corporation ("JSC"), Amerisure Mutual

Insurance Company ("Amerisure"), Wayne Stolarik ("Stolarik"), Debra Gaertner ("Gaertner"),

Steven Jarabek ("Jarabek"), and Charles Carroll IV ("Carroll") for discrimination in violation of the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, (Count I), intentional infliction

of emotional distress (Count II), retaliatory discharge (Count III), fraudulent conspiracy to coerce

Ulatowski to abandon rights (Count IV), and constructive fraud and conspiracy to commit fraud

(Count V). Defendants Stolarik, Gaertner, Jarabek and Carroll have been dismissed. *See* Minute

Order 7/1/04, Dkt. No. 50-1; Minute Order 7/13/04, Dkt. No. 53-1; Minute Order 7/30/04, Dkt. No.

62-1; Minute Order 8/17/05, Dkt. No. 71-1. In addition, the court dismissed Counts II, III, IV and

V against JSC and Counts I, III, IV and V against Amerisure. *See Ulatowski v. John Sterling Corp.,*

*et al.*, No. 03 C 8847, 2004 U.S. Dist. LEXIS 11181, *8-22 (N.D. Ill. June 16, 2004); *see also*

Minute Order 7/13/04, Dkt. No. 53-1. Accordingly, Count I is the sole remaining claim against JSC,

and Count II is the sole remaining claim against Amerisure. *Id.* JSC and Amerisure move for

summary judgment under Fed. R. Civ. P. 56.

1

# BACKGROUND

All facts are undisputed unless otherwise noted.[1] JSC manufactures home hardware products, such as closet poles and towel racks. JSC Facts at ¶ 7. Amerisure provides insurance coverage to employers for workers' compensation, and provided workers' compensation coverage to JSC at all relevant times. *Id.* at ¶¶ 8-9.

Ulatowski began employment with JSC on March 27, 2000 as an assembler in the tube mill department. *Id.* at ¶¶ 10-11. The tube mill department has two production lines, the Doboy line and the Eastey line. *Id.* at ¶ 20. The Eastey line operation involves assembling and packaging of steel poles. *Id.* at ¶ 23. The Doboy line operation involves placing aluminum tracks and closet rods onto a moving conveyor. *Id.* at ¶ 26. The Eastey line runs at a faster pace than the Doboy line and requires different movement of an employee's hands and wrists. *Id.* at ¶ 24. Both production lines require repetitive hand movements. *Id.* at ¶ 12; Ulatowski Facts at ¶¶ 16, 24.

Ulatowski initially performed production duties on the Eastey line; she was assigned to the Doboy line in June 2000 after she complained of wrist pain. JSC Facts at ¶¶ 16-17; Ulatowski Facts at ¶¶ 31, 33. Ulatowski worked on the Doboy line from June 2000 to January 2002, when she was again reassigned to the Eastey line. Ulatowski Facts at ¶¶ 34, 40. On February 11, 2002, Ulatowski complained of wrist pain to Scott Braden, her direct supervisor. *Id.* at ¶ 41; JSC Facts at ¶ 36. Braden removed Ulatowski from the Eastey line and assigned her to work in the designer brackets division, packaging storage hangers. Ulatowski Facts at ¶¶ 42-43; JSC Facts at ¶ 37. On February 13, 2002, Ulatowski told Debra Gaertner, JSC's human resources assistant, that her wrists were sore and

---

[1] JSC filed a reply to Ulatowski's response to JSC's statement of undisputed material facts. This response is not authorized by Local Rule 56.1 and is disregarded.

2

swollen and she needed to see a physician. Ulatowski Facts at ¶ 44; JSC Facts at ¶ 38. That same day, Gaertner scheduled a doctor's appointment for Ulatowski and she saw the doctor. JSC Facts at ¶¶ 40-41. Following her appointment, Ulatowski provided JSC with work restrictions, effective through February 19, indicating she was to wear a splint on her left hand at home and work; she was not to perform work with her right hand that would normally be performed with both hands. *Id.* at ¶ 43. On February 14, JSC reported Ulatowski's wrist injury to Amerisure. *Id.* at ¶ 42; Amerisure Facts at ¶ 5. Ulatowski received workers' compensation benefits for her February 14, 2002 carpel tunnel injury. Amerisure Facts at ¶ 6.

Ulatowski's work restrictions prevented her from working on either the Doboy or Eastey lines. JSC Facts at ¶ 45. From February 13-18, Ulatowski was reassigned light-duty work in designer brackets. Ulatowski Facts at ¶ 51. On February 19, Ulatowski provided JSC with a second medical work restriction indicating she was not to perform repetitive motions with either her left or right hand and the restrictions would be in effect until March 8, 2002. *Id.* at ¶¶ 53-58; JSC Facts at ¶ 47. On February 21, Ulatowski was assigned light-duty office work and the task of reading safety books, manuals, and other employment related documents. Ulatowski Facts at ¶¶ 59-60; JSC Facts at ¶¶ 49. The light-duty office work was temporary, and not a regular full-time JSC position. JSC Facts at ¶ 53. From February 21, 2002 through August 25, 2003, Ulatowski did not perform any job duties within the tube mill department. *Id.* at ¶ 51.

In March 2002, Ulatowski sought continued treatment for her carpal tunnel syndrome; her physicians maintained her condition was work-related, ordered she not perform repetitive hand and arm movements and continue to wear splints, and recommended surgery. Ulatowski Facts at ¶¶ 66-70. On May 3, 2002, Ulatowski had carpal tunnel release surgery on her right wrist. *Id.* at ¶ 71; JSC

3

Facts at ¶ 54. Following surgery, Ulatowski provided JSC with additional medical work restrictions indicating she could only perform light finger tasks. JSC Facts at ¶ 55. The restrictions were updated on June 13 to provide she could only perform office tasks with no heavy lifting or repetitive activities. *Id.* Ulatowski's work restrictions made her unable to perform the essential functions of her normal production job on either the Eastey or Doboy lines, or any other line work within her department. *Id.* at ¶ 56.

On July 18, 2002, Gaertner and Wayne Stolarik, JSC's human resources manager, approached Ulatowski, showed her four specific tasks, and asked whether she could perform the tasks and return to the factory floor. Ulatowski Facts at ¶¶ 78-79. Ulatowski said she could not perform the tasks, stressed that both of her hands were in splints and that her right wrist was still swollen from surgery. *Id.* at ¶ 80-82. Stolarik informed Ulatowski that he and Gaertner were meeting with Dr. Grossman, Ulatowski's treating physician, to determine whether she could perform certain light-duty finger tasks within her work restrictions. *Id.* at ¶ 83; JSC Facts at ¶ 57. On July 18, Stolarik and Gaertner met with Dr. Grossman. JSC Facts at ¶ 57. Stolarik showed Dr. Grossman the four assembly tasks JSC desired Ulatowski to perform, but did not inform him of the speed at which she would be required to perform the assembly tasks. *Id.* at ¶ 58; Ulatowski Facts at ¶ 91. JSC contends Ulatowski could have performed the tasks at any speed she thought appropriate and there was no set rate at which she was required to perform. JSC Facts at ¶ 59. In a July 18 report, Dr. Grossman stated:

> An office visit with representatives from her employer was conducted. The question revolves around whether or not she can be released to slightly more aggressive tasks. The representatives from her employers [*sic*] inquire if light duty tasks involving no significant weight and use of the fingers only could be performed. I observed the tasks that they wish to include in her repertoire. They are easily accomplished with

> finger motion without wrist motion. They are exceptionally light duty. Additionally, both the individuals from her employer represented to me that the patient indicated that she could perform these tasks. Accordingly, will liberalize her activities to include those.

Ulatowski Facts at ¶ 92. Dr. Grossman further described Ulatowski's work restrictions as "finger tasks only as tolerated until next eval. on 8-8-02." *Id.* at ¶ 93. Stolarik informed Ulatowski that Dr. Grossman indicated she could perform the four tasks and that she was to begin the tasks on July 22, 2002. JSC Facts at ¶ 60. Ulatowski refused to perform the assigned finger tasks and stated that she did not want to mess up her hands. *Id.* at ¶ 62; Ulatowski Facts at ¶ 95.

Ulatowski worked in the assembly small parts department from July 22 until shortly before her second surgery for carpal tunnel syndrome on September 6, 2002. Ulatowski Facts at ¶ 103; JSC Facts at ¶ 68. Following surgery, Ulatowski provided JSC with medical work restrictions indicating she was to wear a splint on her left hand and could only use her left hand for pencil, paper and telephone tasks of trivial weight. JSC Facts at ¶ 69. In addition, her work restrictions with regard to her right hand were to continue. *Id.* Ulatowski's work restrictions made her unable to perform the essential functions of her normal production job of working on either the Eastey or Doboy lines, or any other line work within her department. *Id.* at ¶ 70; Ulatowski Facts at ¶ 118. JSC assigned Ulatowski light-duty office work consisting in part of: (1) once a week placing vendor checks in envelopes and filing them; (2) filing prints and drawings for the engineering department approximately two hours per day; (3) cutting signs and sign paks for the marketing department approximately two hours per day; and (4) matching freight bills for approximately two hours per week. JSC Facts at ¶ 63. The light-duty office work was a combination of tasks from various office staff jobs and was not a full-time or permanent position. *Id.* at ¶ 64. Ulatowski understood that the

light-duty office work assigned to her following her second surgery was only temporary in nature, and was not a permanent reassignment to a new or different job. *Id.* at ¶ 71.

Amerisure received and reviewed Ulatowski's medical records. Ulatowski Facts at ¶ 120. Steve Jarabek, an Amerisure claims adjuster, knew as of January 10, 2003 that one of Ulatowski's physicians recommended she be evaluated by anesthesiologists to determine if treatment with stellate ganglion blocks was appropriate. *Id.* at ¶ 121. Jarabek knew the stellate ganglion block treatment was in conjunction with Ulatowski's continued treatment for carpal tunnel syndrome. *Id.* at ¶ 126. Ulatowski's physician, Dr. Shaku Chabbria, attests the ganglion block treatment was part of Ulatowski's overall treatment for carpal tunnel syndrome. *Id.* at ¶ 122. On January 6, 2003, Ulatowski had an MRI of her cervical spine. Amerisure Facts at ¶ 8. On or around February 7, 2003, Jarabek determined that the back treatment was not related to the carpal tunnel claim, based in part on "simple logic, if you've got a repetitive motion with your wrists, how would that be related to your back?" Ulatowski Facts at ¶ 129; Ulatowski Appendix, Vol. III, Ex. 14 at 50-51. Jarabek does not recall if he spoke to one of Ulatowski's physicians to discern the reason for cervical treatment, or if he knew anything about the reasons for medical cervical treatment, when he made the decision to deny compensation. *Id.* at ¶¶ 138-39 and Ex. 14 at 54.

On February 13, 2003, Ulatowski was examined by Dr. Chabbria. Amerisure Facts at ¶ 9. Dr. Chabbria attests the cervical investigation and the associated ganglion block treatments were aimed at excluding a possible cause of Ulatowski's pain. Ulatowski Facts at ¶ 123. Dr. Chabbria noted that:

> [Ulatowski] who does factory work has been having multiple problems. She was evaluated by me because of symptoms in the right arm. Workup was done to see whether she has epicondylitis or carpal tunnel syndrome. Carpal tunnel syndrome

was not significant. As she continues to have pain, it was felt that she should have a MRI to be sure that the symptoms are not coming from the cervical spine. MRI was done and some bulging discs have been found. She had a nerve block for the same. . . I think that the patient's symptoms in the right arm have started after a work-related injury, and while she does not have any significant neck pain, her symptoms well could be coming from the neck accounting for her symptoms in the right arm.

Amerisure Facts at Ex. K.

On February 25, 2003, Amerisure assigned Ulatowski's workers' compensation case to AACM for case management. *Id.* at ¶ 10; JSC Facts at ¶ 72. AACM provides case management services for insurance companies and third party administrators. JSC Facts at ¶ 73. On March 12, 2003, Amerisure indicated its intention to obtain an Independent Medical Exam ("IME") regarding Ulatowski's medical condition and her ability to return to work. *Id.* at ¶ 74. IME's are used to determine the scope of work injury under the Illinois Workman's Compensation Act. Amerisure Facts at ¶ 10. AACM, on Amerisure's behalf, selected Dr. Carroll, an experienced orthopedic surgeon with carpal tunnel syndrome experience, to perform the IME. *Id.*; JSC Facts at ¶ 76. At Amerisure's request, AACM arranged for Dr. Carroll to have a written description of Ulatowski's normal job duties and the light duties she was performing, as well as a videotape for Dr. Carroll's review depicting Ulatowski's normal job duties. JSC Facts at ¶¶ 77-78. It is routine for a videotape of job duties to be provided to a physician performing an IME for workers' compensation purposes. *Id.* at ¶ 79. It is also not unusual for the videotape to depict a non-injured employee performing the job duties that the injured employee performed prior to injury. *Id.* at ¶ 80. In response to AACM's request for the videotape, Scott Laskwoski of JSC videotaped an employee performing normal job duties on the Doboy line. *Id.* at ¶ 81. JSC videotaped the Doboy line because Ulatowski preferred working on the Doboy line over the Eastey line; work on the Doboy line was slower and easier on

an employee's wrists. *Id.* at ¶ 82. JSC also provided Dr. Carroll with a written description of Ulatowski's job duties. *Id.* at ¶ 83. The parties dispute the accuracy of the written job description. *Id.* at ¶ 84; Ulatowski Facts at ¶ 167.

On April 11, 2003, Dr. Carroll performed an IME on Ulatowski. JSC Facts at ¶ 85. Dr. Carroll reviewed Ulatowski's medical history including a functional capacity evaluation, medical records of Dr. Chabbria, electrodiagnostic studies, clinical notes, and the job description prior to his examination of Ulatowski. Amerisure Facts at ¶ 11 and Ex. N; *see also* Ulatowski Appendix, Vol. II, Ex. 7. Dr. Carroll opined that Ulatowski was at maximum recovery for carpal tunnel syndrome, she could return to a medium level of work, and should vary her job tasks. *Id.* In addition, Dr. Carroll opined Ulatowski had cervical disc disease, that repetitive activities would not cause or aggravate a degenerative condition in her cervical spine, that the cervical disc disease was a contributing factor to Ulatowski's residual symptoms, and that the cervical spine treatment was not related to the February 2002 injury. *Id.* Finally, Dr. Carroll concluded Ulatowski could return to work on the Doboy production line as long as she varied her tasks, but he cautioned that her return could be complicated by her subjective complaints. *Id.*; JSC Facts at ¶ 86. Dr. Carroll received the videotape of the Doboy line production on May 3, 2003, after his April 11 consultation. The videotape did not change his opinion that was based on the written job description. Amerisure Facts at ¶ 11; Ulatowski Facts at ¶ 166. Based on the IME reports, Amerisure informed JSC that Ulatowski's cervical problems were not related to her workers' compensation carpal tunnel claim, no further benefits would be paid for carpal tunnel syndrome treatment, and no benefits would be paid for cervical spine treatment. Amerisure Facts at ¶ 12; JSC Facts at ¶ 87.

8

Following the IME, Ulatowski continued to provide JSC with notification that she could not perform the essential functions of her production line job. JSC Facts at ¶ 88. In June 2003, Jean Vyanck, who oversaw JSC's office work, informed Stolarik she was running out of office work for Ulatowski to perform. *Id.* at ¶ 89. Stolarik informed Ulatowski there was no further work for her, because her current work restrictions still prevented her from performing the essential functions of her production line job and there was no more temporary office work for her. *Id.* at ¶ 90. JSC told Ulatowski she needed to take a medical leave of absence under the Family and Medical Leave Act ("FMLA"). *Id.* JSC placed Ulatowski on FMLA leave on June 2, 2003 to give her further time to recover and return to her normal production job duties in the tube mill department. *Id.* at ¶ 91. JSC provided Ulatowski with twelve weeks of FMLA medical leave, which began on June 2, 2003 and ended August 25, 2003. *Id.* at ¶ 92.

On August 19, 2003, JSC sent Ulatowski a letter informing her that FMLA leave would expire on August 25, 2003, when she was required to return to her production job on the Doboy line or other B level operations. *Id.* at ¶ 93. On August 22, Ulatowski delivered a letter to JSC stating she was still unable to perform job duties as a Doboy operator and would not return to work on August 25. *Id.* at ¶ 95. In her letter, Ulatowski requested that JSC provide her with a job consistent with her medical restrictions, such as "light duty type work." *Id.* at ¶ 98.

Ulatowski did not return to work on August 25, 2003 and her employment was terminated. *Id.* at ¶¶ 96, 103. At the end of her FMLA leave, Ulatowski was still unable to perform the production duties of her normal job or any other job in the tube mill department, with or without accommodation. *Id.* at ¶ 97. Ulatowski did not inquire about positions open at the end of her FMLA

leave on August 25. *Id.* at ¶ 100. Nor did she contact or communicate with JSC after August 25 to inquire about positions she could perform or her desire to return to work. *Id.* at ¶¶ 101-02.

Ulatowski's carpal tunnel syndrome prohibits her from performing assembly work, work that requires repetitive hand, wrist and arm motions, and manufacturing work. Ulatowski Facts at ¶¶ 202-04. Ulatowski attests her carpal tunnel syndrome prevents her from doing any type of work that involves frequently lifting more than two or three pounds, and that lifting an object of low weight, such as a gallon of milk, causes great discomfort. *Id.* at ¶ 205. Further, Ulatowski attests she has difficulty shopping for food and clothing, cooking, dressing and bathing, and that she has to rely on other people for assistance. *Id.* at ¶¶ 206-07. Ulatowski has been treated for clinical depression and takes anti-depressant medications. *Id.* at ¶ 211.

## DISCUSSION

### I.    Legal Standard

Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once a moving party meets its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56 (e); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.    JSC's Summary Judgment Motion

JSC moves for summary judgment on Ulatowski's ADA disability discrimination claim. Preliminarily, JSC asserts many of Ulatowski's ADA allegations exceed the scope of her EEOC discrimination charge. Specifically, Count I of the amended complaint asserts JSC intentionally discriminated against Ulatowski based on her disability by: (1) failing to accommodate her; (2) terminating her employment; (3) conspiring to provide false video tapes of her job to physicians in order to change work restrictions; (4) forcing her to work outside of her medical restrictions; (5) forcing her to work under false work restrictions; (6) coercing her to take FMLA leave; and (7) threatening that if she did not perform duties beyond her physical impairment she would be fired. *See* Am. Compl. at ¶ 53. Except for the failure to accommodate and termination claims, JSC asserts these allegations exceed the scope of Ulatowski's EEOC complaint.

Setting failure to accommodate and termination aside, Ulatowski does not assert that each allegation provides an independent basis for ADA liability. In her response to summary judgment, Ulatowski argues JSC failed to accommodate her, but she does not argue the remaining allegations independently give rise to ADA liability. Rather, she contends the full history of JSC's conduct is relevant in evaluating whether JSC engaged in the required interactive process. To the extent Ulatowski's allegations collectively sound in disability harassment or retaliation, they exceed the scope of her EEOC charge, which alleged only failure to accommodate and wrongful discharge. *See* Am. Compl. at ¶ 49 (plaintiff filed a complaint with the EEOC for wrongful discharge); *see also, Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir. 1993) (allegations not included in the EEOC charge may not be contained in the complaint). In any event, all allegations will be considered to the extent they pertain to Ulatowski's claims regarding failure to accommodate and termination.

## A.    Disability

Under the ADA, it is unlawful for an employer to "discriminate against a qualified individual with a disability because of the disability . . . in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a).  To state a *prima facie* claim for ADA discrimination, Ulatowski must establish: (1) she is disabled within the meaning of the ADA; (2) she is qualified to perform the essential functions of her job with or without a reasonable accommodation; and (3) she suffered an adverse employment action.  *Dvorak v. Mostardi Platt Assocs.*, 289 F.3d 479, 483 (7th Cir. 2002).  First, Ulatowski must plead the "initial element of an ADA claim, *i.e.*, that she suffers from a 'disability' as defined in the Act."  *Homeyer v. Stanley Tulchin Assoc., Inc.*, 91 F.3d 959, 961 (7th Cir. 1996).  The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of an individual."  42 U.S.C. § 12102(2).  Major life activities refer to activities that are of central importance to an individual's daily life, and include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002); 29 C.F.R. § 1630.2(i).  "Substantially limited" means that the person is either unable to perform a major life function or is "significantly restricted as to the condition, manner or duration" under which the individual can perform a particular major life function, as compared to the average person in the general population.  *Dvorkek*, 289 F.3d at 483; 29 C.F.R. at 1630.2(j).

It is undisputed that Ulatowski's carpal tunnel syndrome constitutes a physical impairment.  However, JSC contends Ulatowski is not disabled because she has not established that carpal tunnel

syndrome substantially limits her in a major life activity. Specifically, JSC argues Ulatowski's inability to perform the functions of her particular job does not substantially limit her in the major life activity of working. Further, JSC contends Ulatowski performs daily activities, maintains a social life, performs vacuuming and mopping to clean her house, and uses her hands to write, answer the telephone, and perform various other office tasks involving trivial weight. JSC concludes Ulatowski is not substantially impaired in an activity central to daily life.

In response, Ulatowski contends her carpal tunnel syndrome prohibits her from using her hands and arms in repetitive motions, thereby precluding her from working in the broad class of jobs involving factory production or assembly work. In addition, Ulatowski contends her carpal tunnel syndrome impairs her ability to perform manual tasks essential to living. For example, Ulatowski states her condition impacts her personal life because her wrists "go limp and she cannot go on" when vacuuming, she cannot pick up objects that have more than marginal weight and she cannot lift her arms above the mid-chest level of her body. Ulatowski Resp. at 8-9. Ulatowski contends these limitations sharply restrict her in shopping, cooking, dressing, bathing, brushing her teeth, and other aspects of personal grooming. *Id.*

Ulatowski has presented sufficient evidence to raise a question of fact on the disability issue. JSC does not dispute that Ulatowski's carpal tunnel syndrome prohibits her from performing assembly work, work that requires repetitive hand, wrist and arm motions, and manufacturing work. *See* JSC Resp. to Ulatowski Facts at ¶¶ 202-04. The EEOC regulations interpreting the ADA provide that the major life activity of working may be substantially limited "if the individual is significantly restricted in the ability to perform a class of jobs or a broad range of jobs in various classes as compared to the average person with comparable training, skills, and abilities." 29 C.F.R.

§ 1630.2(j)(3)(i); *see also, Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 953 (7th Cir. 2000) (to demonstrate severe restriction in ability to work plaintiff must present evidence she is significantly restricted in the ability to perform either a class of jobs or a broad range of jobs); *DePaoli v. Abbott Laboratories*, 140 F.3d 668, 673 (7th Cir. 1998) (plaintiff disabled under the ADA because her restrictions precluded her from performing a "a wide group of jobs in the Chicago area economy: virtually any assembly line job that required repetitive movement"). Therefore, a triable issue of fact exists as to whether Ulatowski's undisputed inability to perform assembly or production work constitutes a disability.

Ulatowski also asserts she is disabled in the major life activity of performing manual tasks. In *Williams*, the Supreme Court rejected an employee's contention that her carpal tunnel syndrome substantially limited her in the major life activity of performing manual tasks because it made it impossible for her to perform certain manual tasks on the job. 534 U.S. at 198. While a disability inquiry is individualized and case specific, inability to perform "occupation-specific" tasks does not necessarily reflect an inability to perform activities of central importance to daily life. *Id.* at 201. "When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *Id.* Unlike the plaintiff in *Williams*, however, Ulatowski provides evidence that carpal tunnel syndrome affects her ability to perform manual tasks in activities of central importance to daily life *outside* the work

14

environment, including activities relating to caring for herself. Drawing reasonable inferences in Ulatowski's favor, she satisfies the first element of a *prima facie* case.[2]

## B.    Qualified Individual

JSC contends Ulatowski has failed to establish the second element of a *prima facie* case: she is qualified to perform the essential functions of her job with or without a reasonable accommodation. JSC argues the evidence overwhelmingly establishes Ulatowski is unable to use her hands in a repetitive nature, an essential function of her position in the tube mill department. JSC contends it was not required to create a permanent light-duty position, or transform temporary light-duty assignments into permanent positions, to accommodate Ulatowski. Finally, JSC contends Ulatowski has not presented evidence establishing the existence of an available position. In response, Ulatowski admits she cannot perform the responsibilities required by a production line position. Nevertheless, she contends JSC failed to reasonably accommodate her by refusing to provide continuing light-duty office work. She asserts that there was sufficient work for her, and that the office work she performed beginning in September 2002 was an available permanent job.

Ulatowski must establish she is a "qualified individual" with a disability, able to perform the essential functions of her job with or without reasonable accommodation. 42 U.S.C. § 12112(a); *Dvorak*, 289 F.3d at 484. Viewing all facts and reasonable inferences in her favor, Ulatowski has not met this burden. It is undisputed that Ulatowski was hired as a production line worker in JSC's tube mill department. Ulatowski Resp. to JSC Facts at ¶¶ 11-12. From February 21, 2002 through

_____

[2]In its reply to Ulatowski's response to the summary judgment motion, JSC argues the affidavit of Robert Holstein, Ulatowski's attorney, purporting to authenticate various medical records should be stricken. The court did not rely on the affidavit or medical documents in its analysis. The argument is moot.

August 25, 2003, she did not perform any job duties within the tube mill department. *Id.* at ¶ 51.

She repeatedly admits she does not have the physical ability to perform essential functions of her position in the tube mill department, with or without an accommodation. Ulatowski Resp. to JSC Facts at ¶¶ 56, 69, 87, 89, 94, 96. Indeed, Ulatowski does not suggest JSC failed to provide her an accommodation that would permit her to perform her production job. Rather, she contends JSC should have accommodated her by providing a full-time office position.

An employer has a duty to reassign disabled employees to vacant positions for which they are qualified. *See e.g., Hendricks-Robinson, et al. v. Excel Corp.*, 154 F.3d 685, 695 (7th Cir. 1998). An employer may offer light-duty assignments as a method of accommodating injured workers. *Id.* at 696. When a light-duty position is created as a temporary position, reassignment to the position need only be temporary. *Id.* The ADA does not require the employer to create a permanent light-duty position, or convert a temporary light-duty assignment into a permanent one. *Watson v. Lithonia Lighting*, 304 F.3d 749, 752 (7th Cir. 2002); *Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 697 (7th Cir. 1998).

JSC accommodated Ulatowski's injury for approximately one year by providing light-duty office work. Unlike *Hendricks-Robinson*, where there was a question of fact as to whether a light-duty job was truly temporary, Ulatowski readily admits that the light-duty office work she performed was temporary. She admits the light-duty office work was a combination of tasks from various office staff jobs and was not a full-time or permanent position, nor a permanent reassignment to a new or different job. Ulatowski Resp. to JSC Facts at ¶¶ 53, 63-64, 70. The undisputed evidence supports JSC's contention that the reassignment to perform office work was not the creation of a new, full-time position. For example, the evidence reflects Ulatowski's office tasks varied

16

depending on the work available. Ulatowski sometimes reviewed safety books, manuals, and other employment related documents. Other times, she completed light-duty office work consisting in part of: (1) once a week placing vendor checks in envelopes and filing them; (2) filing prints and drawings for the engineering department approximately two hours per day; (3) cutting signs and sign paks for the marketing department approximately two hours per day; and (4) matching freight bills for approximately two hours per week. JSC Facts at ¶ 63. The piecemeal make-up of these assignments reflects the office work's temporary nature. Further, JSC sought to have Ulatowski perform other jobs, including work in the assembly small parts department. Regardless of her ultimate physical capability to perform that job, it was clear that JSC did not intend for the office work to become a permanent, full-time position. Finally, when Ulatowski remained unable to return to her production line job after a year of light-duty assignments, JSC provided her with twelve weeks FMLA leave as an additional accommodation. Ulatowski fails to advance evidence raising a factual issue that the light-duty assignment was intended to develop into a permanent position.

Ulatowski also fails to establish the existence of an available office position. "The plaintiff bears the burden of showing that a vacant position exists and that the plaintiff is qualified for that position." *McCreary v. Libby-Owens-Ford Co.*, 132 F.3d 1159, 1165 (7th Cir. 1998). She contends the office work she performed needed to be done each month and JSC thus created a *de facto* position that was open and available to her in August 2003. By asserting JSC created a *de facto* office job for her, Ulatowski essentially argues her admittedly temporary light-duty assignment was converted into a permanent assignment. The ADA does not require the employer to create a permanent light-duty position. *Watson*, 304 F.3d at 752; *Malabarba*, 149 F.3d at 697. Ulatowski relies heavily on the testimony of Gloria Laurin, an accounts payable clerk for whom Ulatowski

performed office work, including filing and mailings, to argue JSC created a permanent full-time office job. She contends Laurin's testimony establishes: (1) there was plenty of office work for Ulatowski to perform; and (2) another employee took over Laurin's filing after Ulatowski left.

Preliminarily, Ulatowski's office work assignments were provided by Jean Vyanck, the office coordinator, not Gloria Laurin. Laurin Dep. at 16-17. Indeed, Ulatowski does not dispute that it was Jean Vyanck who oversaw JSC's office work and who informed Stolarik she was running out of office work for Ulatowski to perform in June 2003. Ulatowski Resp. to JSC Facts at ¶ 88. Nor does the existence of extra work in the office create an issue of fact as to whether a permanent office position was open and available. Laurin's testimony demonstrates Ulatowski performed overflow work of other positions:

> Q:    And would you say she - there was plenty of work for her to do in the office?
> A:    Yes. Plenty of *my work* to do, you know. And as I said before, Cindy was doing other tasks in the office. And those tasks were still there.

Laurin Dep. at 37-38 (emphasis added). Drawing all reasonable inferences in Ulatowski's favor, the testimony does not support her contention that the tasks available were those of a vacant position, as opposed to piecemeal overflow work to assist other employees. The fact another employee took over some of the filing Ulatowski performed while on light-duty is insufficient to create a genuine issue regarding availability of a vacant position. *See Valdez v. Steiner Corp.*, No. 04 C 5726, 2004 WL 1656572, *4 and n.3 (N.D. Ill. July 22, 2004). Ulatowski does not assert the employee was hired to perform the filing, or that the employee completed all duties she performed. It is noteworthy that in her August 22, 2003 letter to JSC, Ulatowski requested to return to "light duty type work" and failed to inquire about open positions at the end of her leave. To a degree, this belies her assertion that she believed a vacant, full-time office position was available. Regardless of her subjective

beliefs, Ulatowski fails to produce evidence to create a genuine question of fact concerning any vacant position for which she was qualified.

Ulatowski fails to establish that she is qualified to perform the essential functions of her job with a reasonable accommodation, or that a reasonable accommodation existed. Her failure to establish this *prima facie* element is fatal to her ADA claim. Although the inquiry may end here, the court briefly addresses Ulatowski's argument that JSC is independently liable under the ADA for failure to accommodate because it failed to engage in the interactive process. Her characterization of the events she contends constitute JSC's failure to engage in an interactive process largely lacks record support. Although an employer is obligated to engage in an interactive process with the employee to determine whether a disability can be accommodated, an employer's failure to engage in the interactive process does not independently give rise to relief under the ADA. *See Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001). The ultimate burden remains on the employee to establish a reasonable accommodation existed. *Mays v. Principi*, 301 F.3d 866, 871 (7th Cir. 2002). For the foregoing reasons, JSC's summary judgment motion must be granted.

## III.    Amerisure's Summary Judgment Motion

Amerisure moves for summary judgment on Ulatowski's claim of intentional infliction of emotional distress. To establish a *prima facie* case, Ulatowski must establish: (1) extreme and outrageous conduct; (2) an intention to inflict severe distress or knowledge there was a high probability that the conduct would inflict severe distress; and (3) the conduct in fact caused severe emotional distress. *McGrath v. Fahey*, 126 Ill.2d 78, 86, 533 N.E.2d 806, 809 (Ill. 1998). Whether conduct is extreme and outrageous requires an objective evaluation of all facts and circumstances. *Id.*, 126 Ill.2d at 90. The distress inflicted must be so severe that no reasonable person could be

expected to endure it. *Id.*, 126 Ill.2d at 86 (citation omitted). Liability only attaches where conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 90, 360 N.E.2d 765 (Ill. 1976) (citation omitted).

Amerisure contends Ulatowski has failed to present evidence to support her allegations that Amerisure tried to force her to return to the factory floor, misrepresented the nature of her position to Dr. Carroll, or procured a fraudulent and phony IME. Amerisure argues Ulatowski has failed to produce evidence of severe emotional distress on account of Amerisure's alleged conduct.[3] Amerisure contends the evidence establishes it legitimately relied on medical opinions of an independent medical doctor to make decisions regarding benefits. Amerisure asserts it rightfully questioned whether back and neck treatments in January 2003 were related to Ulatowski's February 2002 carpal tunnel injury. Amerisure argues there was nothing outrageous about denying coverage for further carpal tunnel and cervical spine treatments, given Dr. Carroll's opinion that cervical spine treatment did not relate to the February 2002 injury, and that the carpal tunnel injury was at maximum recovery. Finally, Amerisure argues Ulatowski has failed to offer evidence that Amerisure's actions caused emotional injury, or that Amerisure intended or knew there was a high probability it would cause emotional injury.

Ulatowski fails to fully respond to Amerisure's motion. Rather, her response contends that Amerisure's behavior was outrageous because: (1) the job description provided to Dr. Carroll did

---

[3] Amerisure also argues Ulatowski's claim is preempted by the Illinois Workers' Compensation Act. Amerisure's argument was rejected on Amerisure's motion to dismiss. *Ulatowski v. John Sterling Corp., et al.*, No. 03 C 8847, 2004 U.S. Dist. LEXIS 11181, *17-19 (N.D. Ill. June 16, 2004).

not completely and accurately describe her position; (2) Dr. Carroll's IME report was "phony;" and (3) her medical benefits were terminated before the IME was completed.

Ulatowski's assertions largely constitute characterization and exaggeration, as opposed to fact. First, she fails to show outrageous behavior that no reasonable person could be expected to endure. *McGrath*, 126 Ill.2d at 86. An employee receiving benefits under the Illinois Workers' Compensation Act is required to cooperate with an independent medical examination. 820 ILCS 305/12. Dr. Carroll, the IME physician, is an undisputedly experienced orthopedic surgeon with carpal tunnel syndrome experience. He conducted an examination and, based on his conclusions, Amerisure determined termination of benefits was justified. Ulatowski asserts that the IME report was an *ex post facto* rationalization for coverage denial. While Jarabek denied coverage prior to the IME, the evidence shows coverage was terminated *pending* the IME. Jarabek Dep. at 80-84, 224; Ulatowski Ex. 14. Ulatowski's characterization of the IME as "phony" and based on an inaccurate job description lacks record support. Dr. Carroll testified that the written job description he was provided accurately described the job duties he reviewed on JSC's videotape of the Doboy production line. Amerisure Facts at ¶ 11; Ulatowski Facts at ¶ 166.

Even assuming Amerisure's conduct was outrageous and that the first *prima facie* element is satisfied, Ulatowski fails to establish that Amerisure's actions caused emotional injury, or that Amerisure intended or knew there was a high probability it would cause emotional injury. Ulatowski submits an affidavit from a physician indicating she suffers from depression relating to her physical condition and unemployment. There is no evidence that Amerisure's actions in fact caused her emotional injury, let alone evidence that Amerisure intended to do so. Viewing the evidence and

21

drawing inferences in Ulatowski's favor, no material issue of fact exists on the intentional infliction of emotional distress claim. Amerisure's summary judgment motion must be granted.

## CONCLUSION

The material facts are undisputed. For the foregoing reasons, John Sterling Corporation and Amerisure Mutual Insurance Company are entitled to judgment as a matter of law.

January 7, 2005                                    ENTER:

                                                   Suzanne B. Conlon
                                                   United States District Judge